## BRISTOL CO. v. BROWN INSTRUMENT CO.

(District Court, E. D. Pennsylvania. August 1, 1923.)

No. 2423.

1. **Patents ⊕⇒328—869,668, for pyrometer, held valid and infringed.**
   The Thwing patent, No. 869,668, for pyrometer operated by use of thermo-electric couple, and designed to make allowance for variations in cold end of the couple, *held* valid and infringed.

2. **Patents ⊕⇒328—1,301,434 held invalid, because anticipated.**
   The Heitman patent, No. 1,301,434, *held* invalid, because anticipated.

3. **Patents ⊕⇒37—Invention not patentable, if lacking in novelty.**
   If claimed invention lacks novelty, it is not patentable, whether there was invention or not.

In Equity. Suit by the Bristol Company against the Brown Instrument Company. Sur hearing on bill, answer, and proofs. Decree for plaintiff.

Howson & Howson, of Philadelphia, Pa., for plaintiff.

Robert M. Barr and Augustus B. Stoughton, both of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. This case concerns three letters patent: (1) No. 783,503, issued February 28, 1905, to William H. Bristol. (2) No. 869,668, issued October 29, 1907, to Charles B. Thwing. (3) No. 1,301,434, issued April 22, 1919, to Edwin J. Heitman.

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

## Patent No. 783,503.

The first-mentioned patent has lost all juridical importance, and has dropped out of the case, because the patent has expired and the plaintiff has withdrawn it from consideration.

## Patent No. 869,668.

[1] This is known as the Dr. Thwing patent. The invention relates to that type of pyrometer which is operated by the use of a thermo-electric couple. The principle which is the basis of the invention is well known. Great merit is claimed for the invention, in that the troublesome element in the problem was used to eliminate the trouble, and invention is denied because what was done was so obviously the thing to do. There was need, however, to be done what Dr. Thwing did, and there was resort to various means of reaching the desired result, and even also to this; but Dr. Thwing was the first to apply this now obvious means. The desired measurement is that of the temperature of what is termed the "hot end" of the thermo-electric couple. What, without the needed correction, is obtained is the difference in temperature of the two ends. None of the several tried expedients to reach the desired result were satisfactory. One difficulty was presented because the temperature of the cold end varied. Dr. Thwing's thought was to let it vary as it listed, but to measure it and have it indicated, so that a corresponding correction would be made in the reading of the "hot end" temperature. This was accomplished by having such a construction as that the needle marking the hot end temperature would be set so as to make the reading vary in accordance with the temperature of the cold end when no current was passing, whatever the latter might be. It is the handicapping or time allowance principle applied in athletic sports.

There is another obstacle to accurate reading of the hot end temperature in what is known to this record as "copper error." Allowance or compensation for this may readily be made. Its practical importance depends upon the instrument in respect to its being of relatively high or low resistance. This broad and roughly outlined description of the patent will suffice for the purpose of applying the legal principles involved, although as a description of the instrument which embodies the invention claimed or of the principles of its operation, it is neither complete nor accurate.

There is in the record of the trial no blunt averment of inutility, but something approaching it in the characterization of the patent as a "paper" one. As has often been observed, a denial of utility comes from a strange source, when it comes from one who is himself using the patented invention and is fighting for the right to continue its use. Litigation over an inutile patent is the most futile of pursuits, and the litigation is of itself most persuasive evidence of at least the commercial value of its subject-matter.

The defense is rather a qualified denial of invention, in that the principle underlying the patented instrument is one which has been long known and applied in numberless ways, so that invention is necessarily limited to the particular instrument devised, and that the in-

strument of the defendant does not infringe either upon any possible claim which the patentee might have made to an invention, and is clearly not within any of the claims which were allowed by the Patent Office. The epithet of "paper patent" has some justification in the fact that the inventor himself voluntarily discontinued the manufacture of the patented instrument. The occasion for this discontinuance, as explained, does not, however, argue inutility, because Dr. Thwing became interested in a different type of instrument and for the time being had no place for this type.

Others, however, including the plaintiff, had a place for it, and it has some bearing upon the fact that the invention was one which stared every one in the face that the chief officer of the plaintiff, in his search for such an instrument, hit upon one which was the counterpart of that which Dr. Thwing had patented. The long search which he had prosecuted, and the several modes of accomplishing what the instrument in suit does, which Bristol and others had found, is very persuasive evidence that the idea was not as obvious as it now seems to be. The fact that Bristol finally hit upon the same idea which Dr. Thwing had applied does not detract from the merit of the claim of the latter to invention. It merely proves that Dr. Thwing was the first to apply it. The plaintiff, having learned of Dr. Thwing's patent, admitted its priority in time and right, and paid for it what, although not a large, was at the same time a substantial, sum. The point which bears the main burden of the defense is that the feature of the Thwing patent which gives it its patentable value is that it is an instrument which "indicates" the temperature of the "cold end," while the instrument used by the defendant is not only without this feature, but it is one which is of no importance, and indeed, if the instrument is used for such a purpose, the reading would mislead as the departure from the correct reading would be from 15 to 150 per cent.

The basis of this defense, and at the same time what seems to us to be the unsoundness of it, will most clearly appear from a listing of the principles of operation involved in the construction of the two instruments. The objective, as already stated, is the true reading of the temperature of the "hot end." The means of measurement employed is the current, which manifests its presence when the two ends of a thermo-electric couple have different temperatures. The measurement, however, is not of the temperature of either end, but of their difference. If one is known and kept constant, and the difference is known, the temperature of the other can be learned. This method was employed by keeping the cold end at a known and constant temperature. There are conductors leading from the thermo-couple to the galvanometer. If the resistance of these conductors is made to vary in correspondence with the variations in the temperature of the cold end, the desired result may thus be attained. This method was devised and patented by Bristol.

If the marking hand or needle, which marks the measurement made by the current passing, is so placed at the start as to compensate for the temperature of the cold end, the needle will indicate on the scale, not the difference between the ends, which the extent of its movement

really measures, but the temperature of the hot end, which is the measurement desired to be known. This placement was made manually. As already stated, none of these methods was in all respects satisfactory. What in this respect Dr. Thwing did was to do by his device automatically what had been before done manually. As again before stated, the correct reading may be affected by the circumstance that the conductivity of copper varies with the temperature, and a correction or compensation for this so called copper error may be needed. If the copper error be negligible or ignored, the position of the marker in the Thwing method will indicate the temperature of the marker when no current is passing. If allowance be also made for copper error, then the temperature indicated will not correspond with the cold end temperature, when no current is passing.

Defendant reads the claims of the Thwing patent to mean that an exclusive proprietary right is asserted to all instruments which show, and on which can be read, this cold end temperature. The defendant's instruments incorporate with the allowance for cold end temperature an allowance for copper error, so that the cold end temperature cannot be read, and, if the marking in degrees is so read, the reading will be in error. Many of the defendant's instruments are so made as that there are no markings by which any reading can be made, otherwise than the reading of the temperature of the hot end. In other words, the claims of the patent are read as if the objective of the Thwing patent was to give a reading of the cold end temperature when no current is passing, and the objective of the defendant's instrument is asserted to be (as beyond doubt it is) not to give a cold end, but wholly and only a hot end, reading.

We are unable to adopt this reading of the claims, or to accept of the argument based upon it. No one in the art is interested in the temperature of the cold end, otherwise than as a means of knowing that of the hot end. The first must be known, so that the proper handicap allowance may be made, in order to have the movement of the needle "indicate" the temperature desired to be known, which is that of the hot end. This is the sense in which the cold end temperature, when no current is passing is "indicated." A proper allowance is made for the extent to which the cold end temperature causes the reading to depart from that of the hot end temperature. The cold end temperature, when no current is passing, is indicated within the meaning of the claims whenever by the means which Dr. Thwing employed an allowance is made, which causes the instrument to show, not the difference in temperature between the two ends, but the temperature of the hot end.

Nor does the coupling of the allowance for cold end temperature, with a further allowance for copper error, in any wise affect the finding of infringement or no infringement. Dr. Thwing devised a means of making a proper allowance for cold end temperature, and also means of compensating for copper error. It might be desired to have the first or both applied, as the departure from the true hot end temperature due to copper error might be negligible or appreciable. Any one who appropriated his first method infringed, and would not have les-

sened the infringement by appropriating both, nor would the guilt of the infringement of the first be escaped by coupling with that another method of compensating for copper error.

We accordingly find claim 1 to be valid and infringed. The validity of claims 2 and 3 is not denied. The sole question is one of infringement. There is no need to discuss this latter question. If claim 1 is not infringed, claims 2 and 3 are not. If claim 1 is infringed, there is no practical value to the defendant in escaping the charge of infringing 2 and 3. We content ourselves with the statement of the findings of validity and infringement of these claims also.

## Patent No. 1,301,434.

[2, 3] This comes into the case solely as a counterclaim. The defense is no invention and anticipation. The real question is the latter. We say this, because the defense of no invention rests upon the averment that both the principle of operation and the application of it made by the counterclaimant were so far within the reach of those having ordinary knowledge and skill that there was no room for the display of the inventive faculty. In view of the finding of anticipation now made, the question of invention has only an academic interest. If the claimed invention lacks novelty, it is not patentable, whether there was invention or was not. The very thought which the patentee, Heitman, utilized, and the way in which he applied it, was known to and had been applied by the employees of the Weston Electrical Instruments Company.

The sole question (after invention) is that of priority. Our fact finding is that Heitman was anticipated. The counterclaim is accordingly dismissed for want of equity.

## Decree.

The plaintiff has the right to a decree, with costs, and leave is granted to submit drafts of a decree in accordance with the views above expressed.

---

⊗⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes